# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| JOSEPH BODNAR, ) | |
| ) | |
|           Plaintiff, ) | |
| ) | |
|       v. ) | Civil Action No. 15-1383 (ABJ) |
| ) | |
| NATIONAL RAILROAD ) | |
| PASSENGER CORPORATION, ) | |
| ) | |
|           Defendant. ) | |
| _____) | |

## MEMORANDUM OPINION

Plaintiff Joseph Bodnar has brought this action against defendant National Railroad Passenger Corporation ("Amtrak"), alleging that Amtrak discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when it revoked his certification to work as a conductor after he failed a color vision test, and it prohibited him from returning to work.  Compl. [Dkt. # 1].  Amtrak has moved to dismiss plaintiff's complaint in its entirety pursuant to Rule 12(b)(6), on the grounds that plaintiff failed to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the relevant adverse employment action, and therefore, failed to properly exhaust his administrative remedies.  Def.'s Mot. to Dismiss [Dkt. # 12] ("Def.'s Mot."); Mem. of Law in Supp. of Def.'s Mot. [Dkt. # 12-1] ("Def.'s Mem.").

The Court finds that plaintiff has plausibly alleged that he suffered an adverse employment action when Amtrak refused to reinstate him in February 2015, after an administrative review board ruled in his favor.  So, the May 27, 2015 EEOC charge was timely filed, and plaintiff properly exhausted his administrative remedies.  Thus, Amtrak's motion to dismiss will be denied.

## BACKGROUND

Plaintiff was employed by Amtrak for 24 years as a qualified conductor. Compl. ¶ 8. He worked primarily in Amtrak's yard in Philadelphia, as well as on several work trains in Philadelphia, New York, and Washington, D.C., and on several passenger trains. *Id.* Plaintiff has suffered from a mild form of colorblindness throughout his entire career, and he asserts that Amtrak has been aware of his condition since the time he was hired. *Id.* ¶¶ 9–10.

During his employment, plaintiff was regularly required to undergo physical examinations, including vision tests. Compl. ¶ 11. On occasion, he failed the initial color vision test, and he would be referred to an optometrist by Amtrak's medical director. *Id.* ¶ 12. Each time, the optometrist provided Amtrak with "detailed information about [plaintiff's] condition," and plaintiff would be found to be medically qualified to continue working as a conductor. *Id.*

On October 4, 2013, plaintiff again failed a routine color vision test. Compl. ¶ 13. As he had in the past, plaintiff provided Amtrak with information from the optometrist confirming that he could carry out his duties as a conductor, but he alleges that for the first time, Amtrak refused to accept this information. *Id.* ¶¶ 13–14. Instead, on November 1, 2013, "Plaintiff was removed from service by Defendant pending the results of [a further] color vision field test." *Id.* ¶ 15.

Amtrak's medical department administered the color vision field test to plaintiff on January 15, 2014. Compl. ¶ 16.[1] Plaintiff failed to identify 31 of the 270 color signals during the test, and based on those results, Amtrak's medical director found that plaintiff "was not medically qualified to perform his duties as a Conductor." *Id.* ¶¶ 20–21.

---

1       Plaintiff insists that the test "was not calculated to be a reasonable representation of the essential functions of Plaintiff's job as a Conductor." Compl. ¶ 17. But the Court need not reach that issue in resolving Amtrak's motion to dismiss plaintiff's complaint as untimely, and so plaintiff's allegations regarding the specifics of the test will not be addressed in this opinion.

On February 26, 2014, pursuant to the procedures laid out at 49 C.F.R. § 242 *et seq.*, plaintiff filed a petition with the Federal Railroad Administration ("FRA"), "seeking an administrative review of Defendant's decision to deny him certification to work as a Conductor." Compl. ¶ 23; *see also* Ex. 2 to Def.'s Mot. [Dkt. # 12-4] ("FRA Decision") at 2.[2]   The FRA's Operating Crew Review Board ("FRA Board") issued a decision on February 10, 2015.   FRA Decision at 9.   The decision states that Amtrak notified plaintiff by letter on January 21, 2014 that "it would be required to deny [plaintiff's] certification as a passenger conductor" based on the failed vision test, and that plaintiff sent Amtrak a rebuttal letter on January 30, 2014, challenging the denial of his certification.   *Id.* at 5.   The FRA Board noted that neither Amtrak nor plaintiff indicated in their filings before the FRA Board "whether Amtrak gave [plaintiff] notice of its final denial decision or whether Amtrak addressed [plaintiff's] rebuttal letter in a written document," as it was required to do by 49 C.F.R. § 242.401(c).   *Id.* at 2.

Ultimately, the FRA Board granted plaintiff's petition on procedural grounds.   FRA Decision at 1, 6–9.   It found that Amtrak never issued a denial decision, leaving plaintiff's rebuttal unanswered, and that "by failing to issue a written document that stated the basis for Amtrak's final denial decision and that addressed [plaintiff's] rebuttal letter," Amtrak "fail[ed] to adhere to the procedural requirements set forth in 49 C.F.R. § 242.401(c) [and] caused [plaintiff] substantial harm."   *Id.* at 6–7.   However, it emphasized that "its authority is generally limited to determining 'whether the denial or revocation of certification or recertification was improper under [the Federal

---

2      Because plaintiff refers to and quotes from the FRA Decision in his complaint, *see* Compl. ¶ 24, the Court may properly consider it in resolving Amtrak's motion to dismiss.   *See Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) ("In deciding whether to dismiss a claim under Rule 12(b)(6), the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

rail safety regulations],' 49 C.F.R. § 242.505(k)," and that its "grant of the petition does not render [plaintiff] eligible or entitled to employment with Amtrak." *Id.* at 9.

Plaintiff alleges that "[d]espite the FRA's decision to grant Plaintiff's Petition, Defendant has failed and/or refused to allow Plaintiff to work as a Conductor from February 10, 2015 to the present." Compl. ¶ 25.  On May 27, 2015, plaintiff filed a charge of discrimination with the EEOC, alleging that the FRA "granted [his] petition on February 10, 2015, but [Amtrak] will not re-instate [him]."  Ex. 1 to Def.'s Mot. [Dkt. # 12-3] ("EEOC Charge").[3]  The EEOC Charge lists the date of discrimination as February 15, 2015.  *Id.*  On June 1, 2015, the EEOC notified plaintiff that it was closing his charge because it was not timely filed, and it provided him with a notice of his right to sue.  Ex. A to Compl. [Dkt. # 1-3] ("EEOC Letter").

Plaintiff initiated this action on August 26, 2015.  Compl.  On November 9, 2015, Amtrak moved to dismiss the complaint pursuant to Rule 12(b)(6).  Def.'s Mot.  Plaintiff opposed the motion on November 23, 2015, Pl.'s Br. in Opp. to Def.'s Mot. [Dkt. # 13] ("Pl.'s Opp."), and Amtrak filed its reply on December 3, 2015.  Def.'s Reply in Supp. of Def.'s Mot. [Dkt. # 14] ("Def.'s Reply").

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*, citing *Twombly*, 550 U.S.

---

3      The Court may also consider the EEOC Charge because plaintiff incorporates it by reference in the complaint.  Compl. ¶ 7; *Gustave-Schmidt*, 226 F. Supp. 2d at 196.

at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*, quoting *Twombly*, 550 U.S. at 556.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## ANALYSIS

To bring a claim of discrimination under the ADA, a plaintiff must first "exhaust [his] administrative remedies by filing an EEOC charge and giving that agency a chance to act on it." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997).  "The ADA incorporates the procedural provisions of Title VII of the Civil Rights Act of 1964, as amended, including the requirement that an injured individual file an EEOC charge 'within one hundred and eighty days after the alleged unlawful employment practice occurred.'"  *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007), quoting 42 U.S.C. § 2000e-5(e)(1).[4]  "Only

---

4       This time period can be extended to 300 days in certain circumstances.  *Mayers*, 478 F.3d at 368.

after exhausting this administrative remedy can an aggrieved person bring suit in district court." *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1366 (D.C. Cir. 1998).

Amtrak has moved to dismiss plaintiff's disability discrimination claim on the grounds that it is time-barred. Def.'s Mem. at 1. It insists that "[t]he allegedly discriminatory act at issue here is Amtrak's decision to remove Plaintiff from service as Conductor, which occurred on November 1, 2013." *Id.* at 4–5. In the alternative, Amtrak maintains that the relevant act of alleged discrimination occurred on January 21, 2014, when Amtrak notified plaintiff that his certification would be revoked. Def.'s Reply at 4. Therefore, Amtrak argues, because plaintiff did not lodge his complaint with the EEOC until May 27, 2015, his administrative appeal was untimely and this action must be dismissed. *Id.*; *see also* Def.'s Mem. at 4–5.[5] Plaintiff responds that the relevant discriminatory act for exhaustion purposes is "Amtrak's decision not to allow Plaintiff to return to work" in February 2015, after the favorable FRA Decision, and he insists that because this denial "was a discrete act of discrimination," his EEOC Charge was timely filed. Pl.'s Opp. at 1–2.

The Court is not persuaded at this stage that the two events identified by Amtrak – plaintiff's removal from service on November 1, 2013, and the notification on January 21, 2014 that his certification would be revoked – were sufficiently final so as to trigger the limitations period. And in any event, based on the allegations of the complaint, the FRA Decision, and the EEOC Charge, the Court finds that plaintiff has plausibly alleged that he was subject to a separate and discrete act of discrimination when Amtrak declined to reinstate him after the FRA Board rendered the decision in plaintiff's favor. So, Amtrak's motion to dismiss will be denied.

---

5       Amtrak also insists that plaintiff's claim must be dismissed because he did not explicitly allege in the complaint "that he timely or properly exhausted his administrative remedies." Def.'s Mem. at 4. But "[f]ailure to exhaust administrative remedies is an affirmative defense. A plaintiff need not plead exhaustion in his complaint." *Moore v. District of Columbia*, 445 F. App'x 365, 366 (D.C. Cir. 2011).

## I.   The Relevant Legal Framework

Under Title VII and the ADA, "time limitations periods commence with the date of the 'alleged unlawful employment practice.'" *Delaware State Coll. v. Ricks*, 449 U.S. 250, 259 (1980), quoting U.S.C. § 2000e–5(e).  Thus, "[d]etermining the timeliness of [a plaintiff's] EEOC complaint, and [the] ensuing lawsuit, requires [the court] to identify precisely the 'unlawful employment practice' of which he complains," when the employment decision was made, and when that decision was communicated to the plaintiff.  *Id.* at 257, 259.

In *Ricks*, the Supreme Court addressed whether the plaintiff, "a college professor, timely complained under the civil rights laws that he had been denied academic tenure because of his national origin." *Id.* at 252.  The plaintiff had joined the school's faculty in 1970, but in February 1973, a faculty committee recommended that he not receive a tenured position, and the committee reaffirmed that recommendation one year later. *Id.*  On March 13, 1974, the College Board of Trustees ("the Board") formally voted to deny the plaintiff a tenured position, and the plaintiff immediately filed a grievance with the Board challenging that decision. *Id.*  On June 26, 1974, as the grievance process was progressing, the Board informed the plaintiff that he would receive a one-year terminal contract, which would expire on June 30, 1975. *Id.* at 253.  The plaintiff signed the contract on September 4, 1974, and the Board denied the plaintiff's grievance on September 12, 1974. *Id.* at 253–54.

The Supreme Court emphasized that "the limitations period commenced to run when the tenure decision was made and [the plaintiff] was notified," and it considered three potential options for that date:  June 26, 1974, when the Board offered the plaintiff the one-year terminal contract; September 12, 1974, when the plaintiff was notified that his grievance had been denied; and June 30, 1975, the final date of the terminal contract. *Id.* at 259–262.  The Court observed that by June

26, 1974, "the tenure committee had twice recommended that [the plaintiff] not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny [the plaintiff] tenure." *Id.* at 262. It thus concluded that the limitations period began when "the College had established its official position – and made that position apparent to [the plaintiff]," which was "no later than June 26, 1974," the date on which the Board offered the plaintiff the terminal contract. *Id.* at 261–62.

The D.C. Circuit faced a similar timeliness issue in *Currier*, 159 F.3d 1363. In that case, the plaintiff's employer asserted that the operative date of the adverse employment action for limitations purposes was May 14, 1996, when the plaintiff's immediate supervisor had notified him by letter that he would be terminated due to claims that he had sexually harassed a coworker. *Id.* at 1365, 1367. The plaintiff insisted that the limitations period did not start until much later, because immediately after receiving the termination letter, the plaintiff had been assured by high-level management officials "that there would be 'no final determination' regarding his employment status until [a] second investigation was concluded," and because he was told by the same officials late as November 1996 that the investigation was still ongoing. *Id.* at 1365. The D.C. Circuit agreed with the plaintiff, concluding that he had at least "created a genuine issue on this material fact" as to whether the May 14, 1996 termination letter "was final so as to start the clock on the EEOC filing deadline," because "an authoritative voice" – the senior management official – "expressly disavowed the finality of the initial determination" pending the results of the second investigation into the claims against the plaintiff. *Id.* at 1366–67.

As *Ricks* and *Currier* indicate, identifying when the limitations period begins to run on a discrimination claim requires determining "when the [employment] decision was made and [the plaintiff] was notified." *Ricks*, 449 U.S. at 259; *see also Currier*, 159 F.3d at 1366 ("We begin

with the question of when (if ever) appellant had notice that the termination decision was final so as to start the clock on the EEOC filing deadline."), citing *Ricks*, 449 U.S. at 261 (holding that the starting point for the deadline occurs when plaintiff has notice of an official, *i.e.*, not "tentative," decision).   The date of the alleged discriminatory act – and therefore, the commencement of the limitations period – is a case-specific inquiry.   *See Ricks*, 449 U.S. at 258 n.9 (because "[c]omplaints that employment termination resulted from discrimination can present widely varying circumstances[,] . . . [t]he application of the general principles [of the rule] necessarily must be made on a case-by-case basis").

Another judge in this District recently observed that "cases following *Ricks* suggest that the communication to the plaintiff must meet at least some minimum formality requirements before it is deemed to trigger the running of the limitations period," and he articulated a number of factors considered by those courts.   *Gordon v. Office of the Architect of the Capitol*, 928 F. Supp. 2d 196, 205 (D.D.C. 2013).   "First, courts must focus on the employer's action, not on the employee's subjective beliefs."   *Id.* (citations omitted); *see also Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896 (D.C. Cir. 1998) (citing *Ricks* for the proposition that "notice of final action fixes the timing of an act of employment discrimination for statute of limitations purposes, even when the employee actually works for a long time thereafter").   "Second, the action carries official trappings, which is often communicated in written form."   *Gordon*, 928 F. Supp. 2d at 205, citing *Ricks*, 449 U.S. at 253 n.2 (decision communicated in official letter from the President of the Board of Trustees of the employer college).   "Finally, the communication to the plaintiff is made by someone with sufficient authority to render the decision definite."   *Id.*, citing *Ricks*, 449 U.S. at 262 (communication by President of Board of Trustees after "the tenure committee had twice recommended that [the plaintiff] not receive tenure; the Faculty Senate had voted to support

the tenure committee's recommendation; and the Board of Trustees formally had voted to deny [the plaintiff] tenure"). The Court has undertaken to apply all of these authorities to the facts set forth in plaintiff's complaint, resolving all inferences in favor of the plaintiff.

## II.   The Alleged Unlawful Employment Practices

The parties have identified three potential dates for the adverse actions challenged in plaintiff's discrimination claim: plaintiff's removal from service on November 1, 2013; Amtrak's January 21, 2014 letter notifying plaintiff that it would be denying his conductor certification; and Amtrak's decision not to reinstate plaintiff in February 2015 after the FRA Decision.

### A.      The November 2013 Removal from Service

Amtrak first contends that the relevant discriminatory act for limitations purposes occurred on November 1, 2013, when Amtrak removed plaintiff from service as a conductor. Def.'s Mem. at 4–6. But the allegations of the complaint, which the Court must accept as true at this stage, indicate that this was not a sufficiently final decision to trigger the statutory period. Plaintiff specifically alleges that "[o]n or about November 1, 2013, [he] was removed from service by Defendant *pending the results of his color vision field test*," which would "determine if he could perform his duties as a qualified Conductor." Compl. ¶¶ 15–16 (emphasis added). From that allegation, the Court cannot infer that the decision was accompanied by any indicia of finality; indeed, the complaint suggests that plaintiff was placed in a temporary status, the outcome of which was entirely contingent on the results of a subsequent vision test. Considering that plaintiff has alleged that he was found to be qualified to serve as a conductor multiple times in the past after failing initial tests, once Amtrak had received additional information regarding his vision abilities and impairment from an optometrist, *see id.* ¶¶ 11–12, and in the absence of any indication that a formal, written, or otherwise official decision was made or communicated to plaintiff at that

10

juncture, the Court finds that plaintiff has plausibly alleged that his November 1, 2013 removal from service did not constitute a final employment "decision," or that he was "notified" of that final decision, so as to trigger the limitations period. *See Ricks*, 449 U.S. at 259; *see also Gordon*, 928 F. Supp. 2d at 205.

### B.   The January 2014 Certification Decision

Amtrak next asserts that "*at the very latest*, the statute of limitations commenced on January 21, 2014," when Amtrak "notified [plaintiff] . . . that it was denying his conductor certification" and "confirmed he was not being reinstated." Def.'s Reply at 4 (emphasis in original). This is a closer question, but upon review, the Court concludes that the January 21, 2014 letter was also insufficiently final to launch the limitations period. That is because Amtrak failed to perform the steps prescribed in 49 C.F.R. § 242.401, which sets forth the procedures that must be followed in connection with a certification decision.

That regulation first provides:

> (a) A railroad shall notify a candidate for certification or recertification of information known to the railroad that forms the basis for denying the person certification and provide the person a reasonable opportunity to explain or rebut that adverse information in writing prior to denying certification. A railroad shall provide the conductor candidate with any written documents or records, including written statements, related to failure to meet a requirement of this part which support its pending denial decision.

49 C.F.R. § 242.401(a). And it continues:

> (c) If a railroad denies a person certification or recertification, it shall notify the person of the adverse decision and explain, in writing, the basis for its denial decision. The basis for a railroad's denial decision shall address any explanation or rebuttal information that the conductor candidate may have provided in writing pursuant to paragraph (a) of this section. The document explaining the basis for the denial shall be served on the person within 10 days after the railroad's decision and shall give the date of the decision.

49 C.F.R. § 242.401(c).  Taken together, these provisions suggest that a railroad cannot render a final certification decision without first providing the employee with the evidence against him and affording him an opportunity to respond, and then communicating the basis for the final decision to the employee in writing, answering each of the points raised in rebuttal by the employee.  In other words, there is a regulation that specifies the "minimum formality requirements" that would accompany a final employment action in this particular case.  *See Gordon*, 928 F. Supp. 2d at 205.

In this case, the FRA Board found that "Amtrak has neither provided the Board with a written document, explaining the basis for Amtrak's final denial decision and stating the final decision date, nor indicated whether such a written document was timely issued by Amtrak to [plaintiff], as required by 49 C.F.R. § 242.401(c)."  FRA Decision at 6.  And in its pleadings, Amtrak does not deny that it "failed to comply with 49 C.F.R. § 242.401(c)," by not issuing a final denial decision letter and leaving plaintiff's January 30, 2014 rebuttal letter unanswered.  FRA Decision at 6; *see generally* Def.'s Mem.  So, based on the record and granting plaintiff the favorable inferences to which he is entitled, it does not appear that Amtrak *ever* provided plaintiff with final, written notice that it had decided to deny his conductor certification, as required by 49 C.F.R. § 242.401(c), let alone that it did so in January 2014.

Amtrak did present plaintiff with a letter on January 21, 2014, after he failed the second color vision field test.  *See* FRA Decision at 6.  But Amtrak did not attach that letter as an exhibit in support of its motion to dismiss, and at this stage of the proceedings, the Court is not bound to accept Amtrak's representations in its reply that the letter in fact advised plaintiff that Amtrak "was denying his conductor certification" and "confirmed he was not being reinstated."  Def.'s Reply at 4.  In the absence of the actual letter and in accordance with its duty to resolve any inferences in plaintiff's favor at this stage, the Court notes that the FRA Decision plainly

characterizes the January 21, 2014 letter as an interim step.  *See* FRA Decision at 6 (observing that

no final decision document had been produced – "only the letter dated January 21, 2014,

concerning Amtrak's *pending* denial decision, was filed in the docket") (emphasis added).[6]  The

preliminary nature of this "pending denial decision" is reinforced by the fact that plaintiff was

given the opportunity to, and did, provide a written rebuttal to the January 21, 2014 letter, pursuant

to 49 C.F.R. § 242.401(a).  *See* FRA Decision at 5.  It appears that Amtrak never responded to that

letter.

For those reasons, and granting plaintiff the reasonable inferences to which he is entitled

based on the complaint and the documents properly before it at this stage, the Court concludes that

Amtrak failed to make and/or failed to notify plaintiff that it had made a final certification denial

decision in his case in the manner required by 49 C.F.R. § 242.401(c).  Therefore, it finds that the

letter issued in January 2014 did not transmit a decision that was sufficiently final to trigger the

limitations period.[7]

C.    **The February 2015 Failure to Reinstate**

Finally, even if either of the two events identified by Amtrak had constituted a final

decision with regard to plaintiff's employment, his ADA claim still survives the motion to dismiss.

---

6    *See also* FRA Decision at 6 ("By letter dated January 21, 2014, Amtrak notified [plaintiff] that it would be required to deny [his] certification based on [his] failure to meet the visual acuity standards set forth in 49 C.F.R. § 242.117.  Amtrak notified [plaintiff] that he had a fifteen-day period to rebut or provide an explanation to Amtrak's *pending* denial decision.") (emphasis added) (citation omitted).

7    Amtrak may well be able to show at summary judgment that a final decision letter was provided to plaintiff pursuant to 49 C.F.R. § 242.401(c), or that its certification denial decision was communicated to plaintiff in another way so as to render it sufficiently final and trigger the limitations period.  But in light of the regulation's explicit requirements, and granting plaintiff the reasonable inferences to which he is entitled, there is a question of fact remaining on the finality of the certification decision which precludes dismissing plaintiff's discrimination claim as a matter of law.

That is because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). And here, the Court finds that plaintiff has plausibly alleged that there was another discrete act of discrimination when he sought reinstatement in February 2015 after the FRA Decision, and Amtrak denied the request.

Amtrak insists that it "never made a reinstatement decision, and thus took no independent employment action (adverse or otherwise) in connection with restatement." Def.'s Mem. at 1. And the Court agrees that plaintiff's complaint does not precisely allege that he formally sought and was formally denied reinstatement. But the complaint does state that "[d]espite the FRA's decision to grant Plaintiff's Petition [on February 10, 2015], Defendant has failed and/or refused to allow Plaintiff to work as a Conductor from February 10, 2015 to the present." Compl. ¶ 25. And plaintiff's EEOC Charge, filed on May 27, 2015, lists the date the "discrimination took place" as February 15, 2015, and it explains that "[t]he Federal Railroad Administration granted [plaintiff's] petition on February 10, 2015, but [Amtrak] will not re-instate [him]." EEOC Charge at 1. Taken together, and granting plaintiff the reasonable inferences to which he is entitled, the Court finds that plaintiff has alleged enough to state a discrimination claim based on Amtrak's failure to permit him to return to work after the FRA Board rendered its decision in his favor.

Amtrak also asserts that "[t]he fact that Amtrak has not reinstated Plaintiff as Conductor is not an independent, actionable adverse employment action," and it relies heavily on the D.C. Circuit's recent decision in *Kaufman v. Perez*, 745 F.3d 521 (D.C. Cir. 2014). Def.'s Mem. at 6; *see also id.* ("Failing to reinstate Plaintiff is not 'a significant change in employment status' because nothing changed – it simply was a continuation of the status quo directly resulting from Amtrak's decision to remove Plaintiff from service on November 1, 2013."); Def.'s Reply at 3–5. But the Ninth, "First, Third, Fourth, Tenth, and Eleventh Circuits . . . expressly recognize

discriminatory failure to reinstate as a separately actionable claim," *Josephs v. Pac. Bell*, 443 F.3d 1050, 1060 (9th Cir. 2006) (collecting cases), and the D.C. Circuit itself suggested in *Kafuman* that "a failure to reinstate might in some circumstances constitute an independent discriminatory act." 745 F.3d at 529.  So Amtrak's assertion that *Kaufman* "held that a failure to reinstate does not constitute an independent adverse action commencing or resetting the statute of limitations," Def.'s Reply at 1, paints with too broad a brush.

In any event, *Kaufman* is distinguishable.  In that case, the plaintiff's responsibilities assisting his office's Ombudsman were revoked after he engaged in a pattern of unprofessional and inappropriate behavior during official meetings. *Kaufman*, 745 F.3d at 523.  He was informed via written memorandum on December 14, 2000 "that he would no longer be performing Ombudsman's duties." *Id.*  On multiple occasions after his responsibilities were reduced, the plaintiff asked to be permitted to resume working for the Ombudsman, and his requests were repeatedly denied. *Id.* at 524–25.  Ultimately, the plaintiff challenged nine separate aspects of his employer's decisions with regard to his demotion, but an Administrative Law Judge dismissed the case in its entirety, finding that the only actionable employment decision was the initial removal of the plaintiff's Ombudsman duties on December 14, 2000, and not any of the subsequent refusals to restore those responsibilities. *Id.* at 525–26.

The D.C. Circuit affirmed. *Id.* at 528–30.  It noted that "courts have found failures to reinstate actionable in the face of uncertainty regarding the initial adverse action." *Id.* at 529–30, citing *Rich v. Associated Brands, Inc.*, 379 Fed. App'x 78, 82 (2d Cir. 2010) (suggesting that failure to rehire can be independently actionable if employee does not receive "definite notice" that original termination foreclosed employment for foreseeable future).  But it determined that the plaintiff "was barred from performing Ombudsman duties as of December 14," and that the

15

finality of that decision was "reiterated time and again" to the plaintiff. *Id.* at 528. Because the "prohibition was clear from the beginning, and that clarity never abated," and because the plaintiff "failed to demonstrate any uncertainty about his prohibition" at any point after December 14, the Court agreed that the subsequent refusals to restore his Ombudsman duties were just "'delayed, but inevitable, consequence[s]' of the decision embodied in the [December 14] memo, and thus not themselves actionable." *Id.* at 529–30, quoting *Ricks*, 449 U.S. at 257–58.

By contrast, plaintiff here has alleged facts sufficient to show that there was no clear and unequivocal commitment to removing him permanently from his conductor duties in November 2013, because that that removal was "pending the results of his color vision field test," Compl. ¶ 15, and that there was no final decision in January 2014, because Amtrak failed to provide plaintiff with a written notice of a certification decision overruling his objections, as required by the regulations. *See* FRA Decision at 6–7. In other words, for plaintiff, the only "status quo" in November 2013 and January 2014 was "pending." Furthermore, in *Kaufman*, there was no change in circumstances between the decision to reduce the plaintiff's duties and his requests for reinstatement; here, when plaintiff allegedly sought reinstatement, he had the benefit of the intervening FRA Decision, which found that Amtrak's decision-making process was incomplete and flawed. *See id.* at 6–8.

Based on these facts, there was enough "uncertainty about [plaintiff's] prohibition" from performing conductor duties, and an intervening event that materially changed his circumstances, to support a claim that Amtrak's refusal to reinstate him in the wake of the favorable FRA Decision was "an independent discriminatory act," and not just a "delayed, but inevitable consequence" of the earlier removal decision. *See Kaufman*, 745 F.3d at 529–30; *see also, e.g.*, *Datto v. Harrison*, 664 F. Supp. 2d 472, 494–95 (E.D. Pa. 2009) (holding that the plaintiff's ADA claim premised on

school's decision to dismiss him from the program was time-barred, but that his ADA claim premised on the school's refusal to reinstate him after he had met their conditions for reinstatement was not); *Mott v. Synthetic Indus.*, CIV. A. 4:94-CV-248RLV, 1995 WL 584734, at *3 (N.D. Ga. Aug. 9, 1995) (finding that the plaintiff had alleged two separate discriminatory acts – placing him on an unpaid medical leave of absence, and refusing to reinstate him after he was cleared to work by his doctor).

Amtrak also argues that permitting plaintiff's reinstatement claim to proceed "'would effectively write the statutes of limitations out of the law,' because each day Amtrak failed to reinstate Plaintiff would trigger the running of the statute of limitations all over again." Def.'s Mem. at 6, quoting *Kaufman*, 745 F.3d at 530. It is of course true that "[a] terminated employee, whether or not he had a valid claim in his termination, cannot come back later and revive a barred claim simply by asking, 'Am I still fired?'" *Kaufman*, 745 F.3d at 530. But the complaint does not indicate that plaintiff simply repeated, "Am I still fired?" It alleges, in effect, that after the FRA issued its decision, he inquired, "Am I still fired, despite the FRA Board's finding that your certification process was procedurally flawed and caused me substantial harm?" *See, e.g.*, Compl. ¶ 25 (alleging that "[d]espite the FRA's decision," Amtrak failed to permit him to work as a conductor); EEOC Charge at 1 (alleging that Amtrak "will not re-instate [plaintiff]" despite the FRA Decision). It is therefore plausible that Amtrak's apparent refusal to consider reinstating plaintiff or even to afford him the final, written decision notice to which he was entitled under the regulations in the wake of the FRA Decision could qualify as an independent discriminatory act, separate from the earlier decision to remove him from service. And at this stage, that is all plaintiff needs to allege.

Finally, Amtrak insists that plaintiff's discrimination claim is insufficiently pled and must be dismissed because "Plaintiff has not pled any facts showing a connection between his disability (or percieved [sic] disability) and Amtrak's failure to reinstate him."  Def.'s Reply at 6.  "To state a disability discrimination claim, a plaintiff must allege facts sufficient to show that (1) he had a disability within the meaning of the ADA; (2) he was qualified for the position with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.  *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 154 (D.D.C. 2013), citing *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc).

Amtrak challenges only the adequacy of plaintiff's allegations going to the third prong of this standard – it insists that "[t]he Complaint is devoid of particular facts showing that the failure to reinstate was discriminatory, and contains no allegations that Amtrak treated Plaintiff differently than non-disabled individuals seeking reinstatement or that it maintained a discriminatory reinstatement process."  Def.'s Reply at 6.  And it is true that the factual allegations regarding the reinstatement decision are thin – plaintiff alleges only that "[d]espite the FRA's decision to grant Plaintiff's Petition, Defendant has failed and/or refused to allow Plaintiff to work as a Conductor from February 10, 2015 to the present."  Compl. ¶ 25.  To withstand summary judgment, plaintiff will have to offer specific evidence showing that the failure to reinstate him despite the favorable FRA Decision was motivated by discriminatory animus.  But construing the complaint and the relevant documents as a whole, and granting plaintiff the inferences to which he is entitled at this stage, the Court can plausibly infer that the failure to reinstate plaintiff was premised on his disability.

Plaintiff has alleged that he was removed from service in November 2013 because of his perceived disability, Compl. ¶¶ 13–15, and that the January 2014 revocation of his certification

18

was a direct result of his failing the color vision field test because of his color blindness.  *Id.* ¶¶ 16–21.  The FRA Board granted his petition for review of that certification decision, finding procedural errors in Amtrak's decision-making process that substantially harmed plaintiff and expressing concern about Amtrak's failure to consider "conditional certification" as an option in plaintiff's case.  FRA Decision at 6–9.  The FRA Board explicitly stated that it "grants [plaintiff's] petition" based on "substantial harm," *id.* at 6, and the regulations provide that "[a] finding of substantial harm is grounds for reversing the railroad's decision," 49 C.F.R. § 242.505(i), so plaintiff was clearly entitled to *something* as a result of the FRA Board's findings in his favor.  But from the record, the Court can only conclude that Amtrak did nothing:  it did not revisit or revise its January 21, 2014 certification letter, and it does not appear that it *ever* provided plaintiff with the final, written notice of its certification decision, as required by the regulations.  The only plausible inference at this stage is that Amtrak's refusal to act in light of the FRA Decision invalidating its certification decision was based on plaintiff's colorblindness, and nothing else.  That is enough to state a claim of disability discrimination under the ADA.[8]

## CONCLUSION

Based on the complaint and the relevant documents, and granting plaintiff the reasonable inferences to which he is entitled at this stage, the Court finds that neither the November 1, 2013 removal from service nor the January 21, 2014 notice advising plaintiff that his conductor certification would be revoked were sufficiently final so as to trigger the limitations period.  And

---

8    Amtrak is correct that the FRA Board's "grant of the petition [did] not render [plaintiff] eligible or entitled to employment with Amtrak."  FRA Decision at 1, 6, 9; *see also* Def.'s Reply at 5–6.  But just because it did not automatically require plaintiff's reinstatement does not mean that it did not provide him with a basis to ask Amtrak to revisit its procedurally-defective decision. Amtrak's failure to do so, or to take any action with regard to plaintiff's employment, suffices at this stage to provide a basis for a separate and independent claim of discriminatory treatment.

in any event, because the Court finds that plaintiff has plausibly alleged that Amtrak's failure to reinstate him in February 2015, after the FRA Board rendered a decision in his favor, was a discrete discriminatory act, plaintiff's EEOC Charge was timely filed.  Accordingly, Amtrak's motion to dismiss will be denied.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  April 26, 2016